**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **DORTHEA BURTON, ex. rel., E.V.,** | ) | **Case No. 11-50067** |
| **A Minor** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Hon. P. Michael Mahoney** |
| **v.** | ) | **U.S. Magistrate Judge** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

## I.      Introduction

Dorthea Burton, on behalf of her minor child, E.V. ("Claimant"), seeks judicial review of

the Social Security Administration ("SSA") Commissioner's decision to deny her claim for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. *See* 42 U.S.C.

§§ 1383(c)(3), 1381a. This matter is before the Magistrate Judge pursuant to the consent of both

parties, filed on July 8, 2011. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## II.      Administrative Proceedings

Claimant first applied for SSI benefits on March 30, 2006 and alleged a disability

onset date of Jan 1, 2006. (Tr. 26-27.) Claimant's initial SSI application was denied on

September 20, later that year. (Tr. 18.) Upon reconsideration, her claim was again denied on

May 1, 2007. (Tr. 18.) Claimant then filed an untimely request for a hearing before an

Administrative

Law Judge ("ALJ"). (Tr. 18.) Despite the flawed request, the case file was sent to the Office of Disability Adjudication and Review. (Tr. 18.) The ALJ, Hon. Steven H. Templin, eventually reviewed the file and requested that a hearing take place. (Tr. 18.)

The first hearing was scheduled on November 7, 2008. (Tr. 18.) Claimant and her mother appeared in court on that date without an attorney to represent them. (Tr. 507-514.) The ALJ advised Burton of her child's right to have an attorney present; after considering the advice, Burton informed that she would like an opportunity to secure representation before the hearing commenced. (Tr. 509-511.) The ALJ granted her request and rescheduled the hearing for April 30, 2009. (Tr. 479, 511.)

Attorney Roger Hutchison appeared in person with Claimant and her mother for the second hearing date in Oak Brook, Illinois. (Tr. 479.) Dr. Kathleen O'Brien testified at the hearing as a medical expert ("ME"). (Tr. 479-490.) Burton and Claimant also testified that day.

After the hearing, the ALJ issued a written decision finding Claimant "not disabled" and denying benefits on May 27, 2008. (Tr. 15-25.) Claimant requested review of the ALJ's decision, and the Appeals Council denied Claimant's request. (Tr. 4-6.) As a result of this denial, the decision of the ALJ is considered the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1455, 416.1481, *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Claimant has now filed a complaint in the United States District Court for the Northern District of Illinois, Western Division, seeking judicial review under 42 U.S.C. §§ 405(g), 1383(c)(3).


### III. Background and Hearing Testimony

Claimant was born on April 26, 1995, making her approximately fourteen years old at the time of the second hearing. (Tr. 272.) She lived with her mother and siblings in DeKalb, Illinois.

(Tr. 217.) Her parents were separated, but although she did not live with her father, he remained active in her life. (Tr. 226.) She claims that she qualifies for SSI benefits due to her diagnoses of attention deficit hyperactive disorder ("ADHD"), major depressive disorder, and anxiety disorder. (Tr. 271, 285, 316.) The latter two for these diagnoses appear to stem from past sexual abuse by a family member. (Tr. 482.)

At the April hearing, the ME was the first to testify and ALJ initially posed questions concerning the first few benchmark steps of SSI analysis (detailed *infra*, at . . .). (Tr. 480-481.) The ME testified that she was familiar with the appropriate medical aspects of the Social Security evaluation process for childhood disability and that there was sufficient information in the record for her to form an opinion as to Claimant's conditions. (Tr. 480-481.) The ME opined that Claimant had the medically determinable mental impairments of ADHD and major depressive disorder. (Tr. 481.) She also noted a previously withdrawn diagnosis of oppositional defiant disorder. (Tr. 481.) She found that the impairments had "more than a minimal or slight effect upon [Claimant's] ability to function in an age-appropriate manner," but that they did not meet the severity criteria within the Listings and none of these impairments would have "marked limitations" on Claimant's ability to function. (Tr. 481-484, 490.)

Specifically, she testified that Claimant's major depressive disorder "occurred following a very serious, traumatic event . . . in February of 2006. . . . [and that] the depression is being attributed to the traumatic event." (Tr. 482.) Claimant was depressed and experienced some level of fatigue. (Tr. 482.) Generally, the ME stated, children that experience traumatic events often have trouble articulating their feelings and may become angry, display social difficulties, and "act out." (Tr. 482.) However, the ME observed that Claimant has been working "pretty hard" in therapy to find ways to control her behavior. (Tr. 482.) The ME indicated some surprise that

Claimant was not diagnosed with some form of post-traumatic stress disorder, but overall, she observed that Claimant's depressive disorder "is improving, and that [Claimant] demonstrates the ability to improve when she has a goal that she finds . . . worth working for." (Tr. 483.) The goal of making her school's basketball team seemed to be a powerful motivator. (Tr. 482.)

Claimant's ADHD was not related to the trauma, but could affect her cognitive and communicative functioning. (Tr. 483.) Even so, Claimant had a history of doing well in school and had been on the honor roll "a number of times." (Tr. 483.) The ME recalled that Claimant told her therapist that she did not trust adults, and it may have contributed to her behavior in school. (Tr. 483.) Yet, "at no point did the school see fit to move her into [a] special education or behavior disorder classroom." (Tr. 484.)

Later in the hearing, Claimant's attorney asked ME why she did not initially mention Claimant's anxiety disorder. (Tr. 494.) The ME explained that it was not "carried through the record" and that "[i]t's very, very common with depression . . . to have an anxious manifestation. So whether [one] make[s] it two separate disorders or whether [it's one disorder], it would amount to the same thing." (Tr. 494.) The attorney left it at that.

When the ME was questioned regarding Claimant's medications, Claimant's mother stepped in to answer. (Tr. 485.) She reported that Claimant was taking Focalin and Zoloft for depression. (Tr. 485.) Claimant had apparently stopped taking her medication, but recently wanted to go back on them because "they were helping." (Tr. 485.)

Next, Claimant's mother, Burton testified before the court. (Tr. 490.) She stated that Claimant's teachers have called her a bully and that she has a history of fighting in school. (Tr. 491.) She claimed that she receives calls from school every other day concerning her daughter's behavior. (Tr. 492.) To address this issue, Claimant participates in her school's "Steps" program,

where students attempt to find ways to resolve conflicts peacefully. (Tr. 493.) Burton testified she has noticed that Claimant is anxious in crowds and has a tendency to get frustrated and argues at home too. (Tr. 493.) Yet, Burton has noticed an improvement in Claimant's behavior and work ethic since she has been keeping up with her medications. (Tr. 495, 497.) "I see a totally big difference," she said. (Tr. 496.) "I see her [acting] more calm[ly] and everything. But – she easily gets upset . . . when things [are] going wrong." (Tr. 496.)

The ALJ saved Claimant's testimony for last and questioned Claimant in regards to her mood and poor behavior at school. (Tr. 490.) Claimant agreed that she has "felt really bad at times," but that counseling has helped her feel better recently. (Tr. 490-500.) She further testified that she really did not "regret" misbehaving at school while still conceding to the ALJ that her behavior was "not appropriate." (Tr. 501.) Things had apparently changed though, in that she no longer acts out, as she has learned how to better "deal" with her attitude – "probably" due to counseling. (Tr. 501.)

The testimony then turned to schoolwork, specifically. (Tr. 502.) Earlier in the year, her normally good grades began a sharp decline. (Tr. 502.) When asked about the dramatic change to her performance in school, she responded that it was attributable only to "T.V." and a lack of concentration. (Tr. 501, 503.) She added that since she recently has become more attentive in taking her medications, her grades have improved along with her mood. (Tr. 501.) Claimant also expressed a strong desire to play basketball for her school team, and identified the activity as an incentive to improve her grades and behavior: "[Y]ou can have ['A's], ['B's], ['C's,] and ['D's,] but no ['F's]. And it was kind of easy because I was getting like ['B's], but like at the beginning of the year[,] I was getting ['F's]." (Tr. 502.)

At the hearing's closing, the ALJ asked Claimant if she gets along with her younger brother. (Tr. 503.) Claimant testified that she is "kind of" close to her younger brother, but that they do not always get along. (Tr. 503.) Sometimes he would act as if he is going to hurt her, but all-in-all, it would not be serious and he would just be playing. (Tr. 504.) Afterward, assuring Burton that she had raised "some really, really nice kids," the ALJ adjourned the hearing. (Tr. 504.)

## IV.    Record Evidence

### A. Medical Records

On February 14, 2006, Claimant was assessed at the Family Service Agency of DeKalb following recent allegations that she was a victim of sexual abuse. (Tr. 194.) Claimant had also just been medically evaluated in regards to her trauma at LaRibida Children's Advocacy Center and Edward Hospital. (Tr. 183-191.) Claimant was ten years old at the time and her mood was described as "anxious" during the consultation, but her affect and mental status were reported "normal." (Tr. 194.)

Before the evaluation, her mother indicated that Claimant had good grades; slept well; had a good appetite; and just recently reported the abuse, although it had been going on since she was eight years old. (Tr. 206.)

Claimant conveyed that she had thoughts about harming herself during the two weeks prior to the assessment. (Tr. 195.) Counselor Carrie Williams set up counseling goals with Claimant that included stabilizing her emotions, decreasing thoughts of harming herself, and recommended that Claimant attend weekly counseling sessions. (Tr. 197.) Claimant reported that she did not want to attend the sessions because she felt better and did not want "to deal with it

anymore." (Tr. 199.) Nonetheless, she returned to counseling in March and still claimed that the abuse had not affected her, even though she reported nightmares about where the abuse took place and admitted that she was angry about what had happened. (Tr. 202.)

The Ben Gordon Center ("BGC") in DeKalb, Illinois completed a comprehensive assessment on June 26 and 27, 2006, at her father's request. (Tr. 217.) He began to notice "a lot of oppositional behavior" and complained that her "mother does not give [Claimant] rules." (Tr. 217.) He also mentioned some behavior problems at school and that he scheduled the assessment because Claimant refuses to talk about her abuse and that he "want[ed] to make sure she's doing ok." (Tr. 217.) As for Claimant, she reported having "no recurrent thoughts of abuse, no flashbacks, or avoidance of situations that [remind] her of the abuse." (Tr. 217.) "She often feels uptight, keeps her eyes open for danger, [and] is shaky. . . ." (Tr. 217.)

The assessor, Amy Brausch, MA, Psychological Extern[1] found that:

- Claimant's family life has been "chaotic," "estranged," "sexually abusive," and "loud." (Tr. 218.)

- Her attendance at school was good, she was enrolled in regular classes, and maintained an "A-B" grade average. (Tr. 220.)

- She sometimes displayed defiant or oppositional tendencies. (Tr. 220.)

- She reported multiple detentions for talking in class and physical fighting. (Tr. 220.)

- Her social interactions with peers and school staff were "variable, [s]atisfactory-fair." (Tr. 220.)

- Claimant appeared clean and casually dressed (Tr. 220.)

- She was overall cooperative with the evaluation, but was at times guarded, evasive, and timid. (Tr. 220.)

---

[1] Extern Brausch, was practicing under and reviewed by Dr. Greg Tierney, Ph.D., LCP, Licensed Clinical Psychologist. (Tr. 232.)

- She had appropriate and fluid thoughts and her attention was satisfactory. (Tr. 221.)

- Her emotional status was also appropriate and "labile." (Tr. 221.)

- She had "no" barriers to her learning ability. (Tr. 221.)

Claimant was ultimately diagnosed with adjustment disorder and "[u]nspecified and oppositional defiant disorder." (Tr. 222.)

> Socially[,] it appears that [Claimant] has friends at school but had some issues with one girl . . .and would get into physical fights with [her]. Academically[,] it seems [Claimant] is an above[-]average student but is sometimes disruptive in class. The relationship between [Claimant] and her father appears strained due to his anger and her oppositional behavior.
>
> (Tr. 222.)

It was recommended that Claimant undergo both individual and family therapy for treatment. (Tr. 222.)

Claimant remained in counseling services with Ms. Brausch throughout the rest of 2006. (Tr. 240-255.) During this time period, Claimant was more receptive to the idea of counseling and was more open to talk about her problems at school and at home. (Tr. 240-255) She often made "limited" or "variable" progress towards her therapy goals. (Tr. 240-255.) Yet, signs of her anxiety and frustration were still present. (Tr. 240-255.) Her progress and attitude seemed to improve with time. (Tr. 240-255.)

On September 14, 2006, Claimant's history was evaluated by DDS physician, Dr. Russell Taylor. (Tr. 209.) Dr. Taylor found "no limitation" in Claimant's ability to acquire and use information, move about and manipulate objects, and that her health and physical well-being was also not limited. (Tr. 210-211.) He found "less than marked" impairments in Claimant's ability to attend to and complete tasks, interact with others, and care for herself (on the basis of her

receiving counseling). (Tr. 211.) "[S]he still gets along well with others, makes friends easily, maintains friendships and gets along with adults. [Although] [s]ome records mention some oppositional defiant tendencies," he wrote. (Tr. 210.) Ultimately, Dr. Taylor concluded that Claimant was "not disabled" because "[n]o domains [were] markedly or extremely impaired." (Tr. 213.)

Upon a request for reconsideration, Claimant underwent another evaluation by DDS physician Dr. Erika Altman on April 30, 2007. (Tr. 257.) Dr. Altman found that Claimant displayed "no limitation" in moving and manipulating objects, "less than marked" limitations in acquiring and using information, caring for herself, and attending and completing tasks. (Tr. 257-259.) However, she did not mark a limitation level in the categories of "Interacting and Relating with Others" and "Health and Physical Well-Being" (Tr. 258-259.) She did note that Claimant has a "serious problem in [expressing] anger and emotions" and "is extremely limited in [her] ability to communicate effectively and obey rules and authoritative figures." (Tr. 258.) Further, that her affect is "flat, mood indifferent and guarded." (Tr. 259.) Dr. Altman also checked a box indicating that Claimant had marked limitations in two domains that functionally equal the listings. (Tr. 260.) Regardless, she ultimately concluded that Claimant was not disabled. (Tr. 26, 256.)

During the spring of 2007, Claimant returned to counseling with Ms. Brausch at BGC regularly. (Tr. 262-269.) The discussion at these sessions mainly focused on Claimant's behavior problems at school and how best to resolve them. (Tr. 262-269.) As the school-year wound down to a close, Claimant had trouble with her teacher again, and did not see a need to change her behavior. (Tr. 266.) Again, during these sessions, Claimant made "limited" to "variable" progress towards her goals. (Tr. 262-269.)

Psychiatrist, Dr. Fatima Hadi, M.D., examined Claimant at the BGC on July 3, 2007.

(Tr. 271.) The doctor's report states that

> [Claimant] is wary, inattentive, distracted, minimally communicative, [is] well-groomed, and appears anxious. Her speech is normal in rate, volume, and articulation[,] and is coherent and spontaneous. . . . She appears downcast. Her affect is constricted. Wishes to be dead . . . but suicidal intentions are not present . . . . There are no signs of . . . psychotic process. Associations are intact, thinking is logical, and thought content is appropriate. There are signs of anxiety. Insight into illness is poor. Social judgment is fair.

> (Tr. 271.)

Claimant was then prescribed Focalin and Prozac, then ordered to continue her counseling with Amy Brausch. (Tr. 271.)

Claimant attended those sessions throughout the year. (Tr. 272-280.) Claimant's family life was the focus in many of the earlier appointments: particularly centering on conflicts between Claimant and her mother. (Tr. 272-273.) By August of 2007, the conversation primarily focused on Claimant's ongoing poor behavior at summer school. (Tr. 274.) During the summer, Claimant reported several instances of insubordination and physical altercations at school. (Tr. 274-280.) Yet, with the exception of two sessions in September and October where she appeared "guarded and hostile," Claimant again seemed more willing to talk about her problems and remained open and "motivated" to change during this time period. (Tr. 274-280.) Every report lists her progress as "variable." (Tr. 272-280.) Aside, during this period, Claimant also alleges a separate instance of sexual abuse by another family member. (Tr. 272, 274.) By the end of the summer, those allegations were under investigation. (Tr. 278.)

That winter, BGC completed another comprehensive assessment update on January 29, 2008. (Tr. 282. (Tr. 282.) Before the evaluation, Claimant asserted that she no longer felt depressed, but had some trouble concentrating after taking Focalin. (Tr. 282.) The assessment report further noted the following:

- Claimant's orientation, intellectual functioning, eye contact, dress, mood, affect, thought process and content, speech, behavior and attitude, and attention span were all categorized as "normal" or in an otherwise positive state. (Tr. 282.)

- Her abilities regarding memory, reliability, judgment, and insight were "fair." (Tr. 283.)

- "Claimant reported only receiving one referral so far this [school] year. She stated that she is no longer hanging out with the friends she use[d] to . . . because of the drama." (Tr. 284.)

- "She reported that her grades have improved from last year (to A's and B's) and has been on the honor roll all [school] year." (Tr. 284.)

- Claimant still met the criteria for ADHD: she had trouble listening when spoken to, organizing tasks, getting motivated, concentrating, and sleeping. She is often forgetful. (Tr. 284.)

- As to her depressive disorder, she is feeling much better since she has been taking her medications. She is "doing better academically and behaviorally at school. . ." (Tr. 284.)

BGC filed a "Comprehensive Assessment Update" on December 18, 2008. (Tr. 448.) During the assessment, Claimant seemed guarded, but "friendly," and unwilling to discuss issues in detail with the evaluator. (Tr. 448.) She expressed a desire to only speak with Ms. Brausch, her regular counselor. (Tr. 448.) It is reported that Claimant's troubles at school continued, but she blamed much of it on other students involving her in "drama" and upsetting her. (Tr. 448.) However, Claimant stated that she has avoided all physical altercations. (Tr. 448.) The Mental Status Assessment checklist indicates that all eleven categories were within normal or positive ranges, except for Claimant's guarded attitude. (Tr. 448.) Claimant also reported that she has several close friends to talk to and was now doing "very well" in school and was involved in basketball and track. (Tr. 449.) That being said, the summary shows Claimant still struggled with her usual symptoms of major depressive disorder and ADHD. (Tr. 449.)

Claimant continued her counseling through that winter and spring. (Tr. 445-447.) Overall, her grades showed a substantial upward trend, but some of her behavioral issues still remained and she was still struggling in one of her classes. (Tr. 445-447.) Sports were indicated

as both a stress-reliever and motivator,[2] as Claimant felt compelled to improve her failing math grade so she could continue playing basketball. (Tr. 446.)

Finally, the most current medical record, a "Psychiatric/Psychological Report for Child" from Dr. Hadi dated April, 29, 2009,[2] was submitted to the ALJ after the hearing. (Tr. 452.) In it, Dr. Hadi indicates that Claimant's depression had relapsed somewhat: "feelings of hopelessness, hygiene concerns, excessive sleep, fatigue, . . . headaches, irritability." (Tr. 452.) It was reported that Claimant was suspended from school on March 3, 2009 for "fighting with a friend." (Tr. 453.) However, Dr. Hadi felt that the "relapse [would be] addressed with medication and counseling. . . ." and that her symptoms "[i]mproved when [Claimant was in] consistent compliance" with her medication in the past. (Tr. 452.)

## B. School Records

The record also contains several evaluations of Claimant made by various school faculty members intermittently from 2006 to 2009. (Tr. 158, 324, 332, 338, 461, 471.) Each includes a numerical method ("1-5") of appraising Claimant's functioning within the "six domains:" (i) acquiring and using information, (ii) attending and completing tasks, (iii) interacting and relating with others, (iv) moving about and manipulating objects, (v) caring for herself, (vi) health and physical well-being. *See* 20 C.F.R. § 416.926a(b)(1). (Tr. 159, 324, 332, 338, 461, 471.)

### 1. The Assistant Principal

The first evaluation seems to have been completed by Claimant's assistant principal in April of 2007. (Tr. 158.)  She opined that Claimant had problems in three separate domain areas: attending and completing tasks, interacting and relating with others, and caring for herself. (Tr. 159, 160, 162.)

As to the "attending" domain, the assistant principal believed that Claimant has "very serious" problems[3] in the following sub-categories:

- paying attention when spoken to directly,
- waiting to take turns,
- changing activities without being disruptive,
- completing class assignments,
- completing work without careless mistakes,
- working without distracting self or others, and
- working at a reasonable pace/finishing on time.
  (Tr. 159.)

She also found significant problems in the "interacting" domain. (Tr. 160.) She lists another seven of thirteen categories as "very serious problem[s]:"

- seeking attention appropriately,
- expressing anger,
- asking permission,
- following rules,
- respecting/obeying adults in authority,

---

[2] Notably, the report was completed the day before Claimant's ALJ hearing. Exhibit "11F/2"

[3] "Very serious" is represented by a rating of "5," the most extreme rating available on the evaluation forms.  (Tr. 159, 324, 332, 338, 461, 471.)

- introducing and maintaining relevant and appropriate topics of conversation, and
- taking turns in a conversation

(Tr. 160.)

Finally, she believes Claimant has problems functioning in the "caring" domain. (Tr. 162.) The following categories were found to be "very serious" problems:

- handling frustration appropriately,
- being patient when necessary,
-  responding appropriately to changes in own mood,
- using appropriate coping skills to meet daily demands of school environment, and
- knowing when to ask for help.

(Tr. 162.)

**2. The Mentor / Teacher**

Teacher and mentor, Ms. Thomas, filled out a "Teacher Questionnaire" to evaluate Claimant in April of 2009. (Tr. 322.) She found that Claimant had trouble functioning in three separate domains. (Tr. 324-329.)

First, concerning the "attending and completing tasks" domain, Ms. Thomas opined that Claimant had "very serious" problems in changing from one activity to another, organizing materials, and completing assignments. (Tr. 324.) Additionally, she believed Claimant had "serious" problems (a rating of "4") in focusing on activities, carrying out instructions, and working without distraction. (Tr. 324.)

In the domain of "interacting and relating with others" she found that Claimant had "very serious" problems in one area: "interpreting meaning of facial expression, body language, hints, or sarcasm." (Tr. 325.) She found "serious problems" in making friends, respecting authority, and using appropriate language and vocabulary. (Tr. 325.)

The third domain in which she saw problems was Claimant's ability to care for herself. (Tr. 327.) She reported Claimant had "very serious" problems in regulating her medications and using good judgment regarding personal safety. (Tr. 327.) Claimant's abilities to handle situations, respond to changes in mood, and use appropriate coping skills were considered "serious problems." (Tr. 327.)

### 3.    The Science Teacher

Claimant's middle-school Science teacher filled out a similar form in April 2009 as well. (Tr. 330.) She also believed Claimant displayed problems in the same three domains. (Tr. 332-335.)

In the "completing tasks" domain, she found Claimant had a "very serious problem" in changing activities without being disruptive and "serious" problems in focusing on activities, organizing materials, completing assignments, and working without distracting herself or others. (Tr. 332.) She stated that Claimant works well "when she wants to work." (Tr. 332.)

She also believes there are significant problems in the "relating with others" domain. (Tr. 333.) She found a "very serious problem" in Claimant's ability to interpret meanings of facial expressions, body language, hints, or sarcasm. (Tr. 333.) "Serious problems" were her capacities to make and keep friends,  seek attention appropriately, respect and obey authority, introduce appropriate conversation, and use appropriate vocabulary. (Tr. 333.)

Claimant's Science teacher also found "serious" issues in the "caring for herself" domain. (Tr. 335.) Although the teacher did not list any "very serious" problems, handling situations, using good judgment for personal safety, responding appropriately to changes in mood, and using appropriate coping skills were all listed as "serious" problems. (Tr. 335.)

### 4. The Math Teacher

Claimant's Math teacher also filled out the form that April. (Tr. 338.) The teacher found two "serious problems" in the "using information" domain: comprehending math problems and applying problem-solving skills in class discussions. (Tr. 339.) The "completing tasks" domain contained a few "very serious problems" (focusing, completing assignments, and working without distractions) and several "serious problems" (refocusing on tasks, organization of materials, careless mistakes, and finishing on time). "Serious" and "very serious" problems were also noted in the domains of "relating with others" and "caring for herself." (Tr. 341-343.)

### 5. The Interventionists

Finally, three school interventionists evaluated Claimant in the same manner. (Tr. 469, 461.) They all found "serious" problems in the domain of "relating to others." (Tr. 464, 472.) However, only one of the three believed there were problems in the "caring for herself" and "completing tasks" domains. (Tr. 471, 474.)

## V. Standard of Review

The court may affirm, modify or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* However, the court conducts a critical review of the evidence when evaluating the ALJ's decision. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

The court will reverse or remand an ALJ's denial of benefits only if the decision is not supported by substantial evidence or based on an error of law. 42 U.S.C § 405(g); *see also Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## VI.     Framework of Decision

A person under the age of 18 is "disabled" if she does not engage in substantial gainful employment and "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

The Commissioner proceeds through three steps in determining whether a claimant under the age of 18 is disabled. *See* 20 C.F.R. § 416.924(a)–(d). The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; and (3) whether the impairment meets, medically equals, or functionally equals the listings. 20 C.F.R. §§

416.924(b)–(d), 416.926a. To determine whether the impairment functionally equals the listings, the Commissioner first considers how the child functions as a whole; this consists of looking at all of the child's activities, which include everything the child does at home, at school, and in her community, and evaluating how the child is limited or restricted in those activities, without sorting the child's impairments into any particular domain. 20 C.F.R. § 416.926a(b)-(c); *see* SSR 09-1p. After determining the activities in which the child is limited, the Commissioner considers which of the following six domains are involved in those activities: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for his or herself; and (vi) health and physical well–being. 20 C.F.R. § 416.926a(b)(1). A child must have "marked" limitations in at least two of the domains, or an "extreme" limitation in one domain, to have an impairment that functionally equals the listings. 20 C.F.R. § 416.926a(a). The Court analyzes each step in the framework to determine whether the Commissioner's decision was supported by substantial evidence.

## VI. Analysis

### A.      Step One: Is the Claimant Currently Engaged in Substantial Gainful Activity?

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 416.924(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 416.910. If the claimant is engaged in substantial gainful activity, he or she is found not to be disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Here, the ALJ determined that Claimant has not engaged in substantial gainful activity at any time relevant to the decision. (Tr. 21.) Neither party disputes this finding. As such, the ALJ's Step One determination is affirmed.

**B.      Step Two: Does the Claimant Suffer From a Severe Impairment?**

Step Two requires a determination whether the claimant is suffering from a severe impairment. A severe impairment is one which is more than a slight abnormality or combination of slight abnormalities, and that causes more than minimal functional limitations. 20 C.F.R. § 416.924(c). If the claimant suffers a severe impairment, then the inquiry moves to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

Here, the ALJ determined that Claimant has severe impairments stemming from her affective disorder (depression) and ADHD. (Tr. 21-22.) Neither party disputes this finding; thus, the ALJ's Step Two determination is affirmed.

**C.      Step Three: Does Claimant's Impairment Meet, Medically Equal, or Functionally Equal an Impairment in the Commissioner's Listing of Impairments?**

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1. The listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. *See* 20 C.F.R. § 416.925(a). To determine whether an impairment functionally equals a listing, the Commissioner considers the child's limitations across six domains: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for his or herself; and (vi)

health and physical well–being.  20 C.F.R. § 416.926(a)(b)(1). A child must have marked

limitations in two of the domains, or an extreme limitation in one domain, to have an impairment

that functionally equals the listings. 20 C.F.R. § 416.926a(a).

A "marked" limitation is one where the impairment interferes with the child's "ability to

independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2). A "marked"

limitation is also characterized as "more than moderate" but "less than extreme." *Id*. The

regulations further state that a child has a "marked" limitation if she has a "valid score that is

two standard deviations or more below the mean, but less than three standard deviations, on a

comprehensive standardized test designed to measure ability or functioning in that domain, and

[the child's] day to day functioning in domain–related activities is consistent with that score." *Id*.

An "extreme" limitation is one where the impairment very seriously interferes with the

child's "ability to independently initiate, sustain, or complete activities" in a domain. 20 C.F.R.

§

416.926a(e)(3). An "extreme" limitation is "more than marked." *Id*. A child has an "extreme"

limitation if he or she tests at least three standard deviations below the mean on a standardized

test designed to measure ability or functioning in a domain. *Id*.

In this case, the ALJ determined that Claimant had "less than marked" limitations in the

domains of "attending and completing tasks" and "ability to care for herself." (Tr. 23-24.) The

ALJ emphasizes the ME's assessment that Claimant's limitations were restricted to "bad

choices" in the "caring for herself" domain, testimony that medication was helping Claimant

improve, and teachers' reports stating that Claimant's ability to compete tasks was "variable"

and often involved distracting other students. (Tr. 23-24, 332, 445-450, 460-476, 483, 486.)

No limitations were found in the domains of "moving about and manipulating objects," "using and acquiring information," and "health and physical well-being." (Tr. 22-24.) To support his decision, the ALJ noted that there was little evidence to show Claimant had limitations in her physical well-being or her ability to move or manipulate objects. (Tr. 23-24.) As to "using and acquiring information, the ALJ observed:

- Claimant's testimony at the hearing that her medications and counseling allowed her to improve her academic performance (Tr. 23, 500-501.);

- Claimant was never enrolled in special education and academically performed at her grade-level (Tr. 23, 484.);

- Claimant's testimony that her school work was not difficult and that she did not complete homework assignments because she was distracted by watching television (Tr. 23, 501-503.);

- BGC's 2006 medical progress notes where the Claimant is described as having good cognitive functioning; "fluid thought process; 'high' learning readiness; and being academically average" (Tr. 24, 217-223.);

- "[m]ost of Claimant's grades from 2006 through 2009 were satisfactory or above." (Tr. 23, 346-347, 354.);

- and "[t]wo of three teachers wrote . . . that [Claimant] had no problems in this domain (Tr. 23, 322-335.)

The ALJ found a single domain where Claimant's limitations were "marked" for a time, concluding that Claimant had "both marked and less[-]than[-]marked limitation[s] in interacting and relating with others." (Tr. 24.) In reaching this conclusion, the ALJ highlights several parts of the administrative record and the three testimonies given at the hearing by the ME, Claimant's mother, and Claimant herself – all of which, according to the ALJ, show "significant" improvement of Claimant's alleged limitations. (Tr. 24-25.) Specifically, the ALJ references:

- ME's testimonial finding that Claimant has improved significantly overall with treatment (Tr. 24, 483, 486.);

- Claimant's testimony and agreement that counseling and medication had improved her behaviors (Tr. 24, 500-501.);

- an updated assessment from BGC on January 29, 2008 that finds all categories in Claimant's "mental status" and functioning were within normal ranges, Claimant was feeling much better since she has been taking her medications, improved her grades significantly, and that she is "doing better academically and behaviorally at school" (Tr. 310.);

- a counselor's report from March 2006 that Claimant has many good friends (Tr. 204.);

- and Claimant's mother's testimony that Claimant was improving: "catching up" on her homework, complying with her medications, and "doing excellent" in the last few weeks (Tr. 24, 496-497.);

### 1. The ALJ's treatment of Ms. Burton's Testimony

The court must generally defer to the ALJ's credibility determination; however, the court must first be certain that a credibility determination has actually been made. *Schroeter v. Sullivan,* 977 F.2d 391, 395 (7th Cir.1992).

When reviewing Ms. Burton's testimony in his written determination, the ALJ writes:

> "[t]he claimant's mother acknowledged the claimant's improvement, but disagreed with the amount of improvement reported in the . . . record or described by the claimant at the hearing. While I credit [Ms. Burton's] sincerity, I do not share her perception that the claimant's behaviors have been so persistent across all contexts as to have continued to result in marked functional limitation in this domain. . . ."

(Tr. 24-25.)

In response, Claimant argues that the ALJ's decision must be remanded and reversed because the ALJ failed to make a credibility finding regarding Ms. Burton's testimony. The

court does not agree. Here the ALJ does not use the oft-derided "boilerplate" language present in most ALJ determinations and he does not overtly use the words "credibility finding," "credible," or "not credible;" his determination is nuanced but its intent is clear. The ALJ found that Ms. Burton's testimony was honest and heartfelt, but disagreed with her opinion that Claimant's impairments rose to the level of marked disabilities. (Tr. 24-25.) Directly before the statement quoted above, the ALJ discusses the contrary ME's opinion, Claimant's testimony, and findings from the record. (Tr. 24.) "When a claimant argues that there are fatal gaps or contradictions in the administrative law judge's opinion, . . . we give the opinion a commonsensical reading rather than nitpicking at it." *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999). The court finds that the ALJ made an adequate and well-supported credibility determination under the circumstances.

Also concerning Ms. Burton's testimony, Claimant believes that the ALJ erroneously limited his discussion of the testimony with respect to only a single domain, interacting and relating with others, when he was required to address all six domains. This argument ignores the fact that Ms. Burton's testimony almost exclusively centered on how her daughter related and reacted to others. (Tr. 491-497.) Aside from a general denial that Claimant's grades had improved, there was little-to-no discussion concerning the other domains in her testimony. (Tr. 491-491.)


### 2. The Omission of Dr. Altman's Report

The ALJ gave great weight to the opinions of the ME; Dr. Taylor, the first agency physician; and Claimant's treating physicians in his Step-Three determination. (Tr. 22-24.) He found "the opinions of the [ME, Dr. O'Brien,] to be the most informed, consistent with the medical evidence of record, convincing, and consistent with the record as a whole." (Tr. 22.)

Throughout his opinion, the ALJ fails to mention DDS physician Dr. Altman's findings made upon reconsideration in April of 2007. Nevertheless, the court declines to remand on this issue for several reasons. First, despite the fact that Dr. Altman checked a box indicating that Claimant had marked limitations in two domains, her ultimate conclusion that Claimant was not disabled was clearly communicated in the record in at least two separate entries and she affirmed Dr. Taylor's general conclusion. (Tr. 26, 256.) Second, the ALJ gave weight to the other physicians of record and the ME; all of whose opinions were that Claimant was not disabled. (Tr. 22-26.) Although it is important for ALJs to consider all of the evidence in the record, there is little reason to believe that the inclusion of Dr. Altman's inconsistent findings would have any effect on the ALJ's ultimate decision. Despite the error, "[n]o principle of administrative law or common sense requires [a court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989); *People of the State of Illinois v. I.C.C.,* 722 F.2d 1341, 1348 (7th Cir. 1983) (Posner, J.) ("But if we are sure that the agency would if we remanded the case reinstate its decision . . . a reversal would be futile. . . ."); *See also, Pawlowski v. Astrue*, 800 F.Supp.2d 958, 967 (N.D. Ill., 2011).

As an aside, the court applies the same reasoning to Claimant's argument that the ALJ erred in determining that Claimant had marked limitations up to February 2006, the approximate time of her abuse, without substantial evidence. (Tr. 24.) Considering the entirety of the ALJ's opinion, at worst, the date in the statement appears to be a typographical error and does not merit remand. (Tr. 22.)

### 3. The ALJ's Evaluation of the Teacher Questionnaires

The ALJ referenced several teacher questionnaires in his determination. (Tr. 22-24.) Within the "acquiring and using information" domain, the ALJ adds that "[t]wo out of three teachers wrote in April 2009 that [C]laimant had no problems in this domain." (Tr. 23.) Next, in the "attending and completing tasks" domain, the ALJ writes:

> Teacher reports from . . . 2009 indicate that [C]laimant had some problems with completing tasks and distracting other students . . . , and it is noteworthy that one [teacher] reported that [her] performance in this domain was 'variable' (indicating that [C]laimant did not consistently fail to do things or engage in inappropriate behaviors).

> (Tr. 23.)

The ALJ also uses two teachers' reports to support his finding in the domain of "moving about and manipulating objects," and briefly references them in Claimant's "ability to care for herself." (Tr. 23-24.) Finally, the ALJ acknowledges that "[t]eacher reports from  . . . 2009 suggest some ongoing problems in [the "interacting and relating with others" domain], but otherwise indicate that [Claimant's] social behavior has improved." (Tr. 24.) Claimant contends that the ALJ erred by failing to discuss the questionnaires in detail and determine their appropriate weight.

The court does not find Claimant's argument persuasive. The Regulations state that ALJs must *consider* teacher's opinions regarding impairment severity and functional effects. *See* SSR 06-03p (emphasis added). The ALJ gave the questionnaires adequate consideration and the court has not received case-law to suggest that an ALJ must discuss each teacher's opinion in-detail or explain the weight given to every opinion. The teachers' opinions, although important, are not medical opinions and are not entitled to controlling weight. Regardless, the ALJ obviously acknowledged and discussed them here, where each mention of the questionnaires in the decision is either accompanied by the ALJ's agreement, controverting medical evidence, or

contradictory testimony.  (Tr. 22-24.) And although the ALJ is not required to detail each and every educator's opinion in the record, he did not "cherry-pick" them as Claimant alleges; the ALJ discussed even those opinions that did not support his finding. (Tr. 23-24.) For example, he writes "[t]eacher reports from . . . 2009 indicate that [Claimant] had some problems with completing tasks and distracting others students (Exhibits 9F and 12F)." (Tr. 23.)

More importantly, the ALJ used substantial evidence, other than the questionnaires, within the administrative record and built a logical bridge between that evidence and his conclusion that Claimant's impairments did not equal a listing:

- the ME's assessment of the entire record and her professional, medical opinion that Claimant was not disabled[4] (Tr. 22-25, 481.);

- Dr. Taylor's opinion that Claimant was not disabled (Tr. 22, 213.);

- Claimant's many counseling and medical records which indicate improvement in her behavior, culminating in the BGC's January 2008 updated assessment (Tr. 310.);

- reports showing improved (honor-roll level) grades and highlighting the fact that Claimant was never enrolled in special education courses and performed consistently within her grade-level (Tr. 23-24, 284-285.);

- and Claimant's testimony that her behavior, mood, and attention significantly improves when she takes her medications. (Tr. 24, 500-501.)

Therefore, the ALJ's findings are supported by substantial evidence. As such, this court affirms the ALJ's Step-Three determination.

---

[4] In adopting Dr. O'Brien's overall opinions, the ALJ also considers her review and assessment of the teacher questionnaires, as she had also reviewed the case file. (Tr. 481.)

**VI. Conclusion**

In light of the foregoing reasons, Claimant's motion for summary judgment is denied and

Commissioner's motion for summary judgment is granted.

**ENTER:**

_____

**Hon. P. Michael Mahoney**
**U.S. Magistrate Judge**

**DATE: July 1, 2013**